[No. S075720. July 27, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CAYETANO CALDERON CAMACHO, Defendant and Appellant.

**COUNSEL**

J. Courtney Shevelson, under appointment by the Supreme Court, and Marsha D. Kennedy, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Robert R. Anderson, Acting Chief Assistant Attorney General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Kenneth C. Byrne, Martin L. Pitha and Gary Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—Police in this case looked through a window and observed defendant packaging cocaine in his home. The officers made this

observation while standing in defendant's side yard, a place they had no legal right to be. The Court of Appeal held the police violated defendant's right to be free of unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and, accordingly, concluded the trial court erred in denying defendant's motion to suppress the evidence against him. We affirm.

## FACTS

On June 26, 1997, police received an anonymous complaint of a "loud party disturbance" at defendant Cayetano Calderon Camacho's house. Officers Wood and Mora, responding to the complaint, arrived at defendant's home around 11:00 p.m. Officer Wood testified that, on arrival, he heard no noise upon exiting his patrol car. Approaching defendant's home, the officers heard no excessive noise. Officer Wood testified, rather, that he heard merely an unidentifiable "audible noise," one that was neither loud, disturbing nor violative of the city's noise ordinance.

The officers did not knock on the front door. Instead, while Officer Wood remained on the front lawn, Officer Mora walked into the side yard of the single-story house. The officers did not have a warrant. The side yard was an open area covered in grass. No fence, gate or shrubbery suggested entrance was forbidden. Neither, however, did anything indicate the public was invited to enter; there was neither a path nor a walkway, nor was there an entrance to the home accessible from the side yard. An opaque brick wall, about six feet nine inches high, blocked entrance into the backyard. A cement block wall of similar height marked the property line between defendant's side yard and the home of his immediate neighbor.

Defendant's home was set back about 20 feet from the public sidewalk. About 20 feet from the front of the house and 40 feet from the sidewalk, Officer Mora came upon a large side window. The window is visible from the public street or sidewalk, but the inside of the room is not. The neighbor on that side of the house would have difficulty seeing into the window because of the high cement block wall separating the two homes. The yard had no exterior lighting.

The window, which was open a few inches, had no blinds, curtains or other covering. Officer Mora, standing in the darkened side yard outside the window, heard music coming from the stereo inside the room, although the music was not loud. A red light bulb dimly lit the room. Returning to the front of the house, Mora reported to Officer Wood that he had seen a man in a room but was unsure whether the man was committing a crime. The two

officers proceeded together back through the side yard to the window. There, Officer Wood saw defendant, sitting with his back to the window, manipulating some clear plastic baggies. Wood saw several baggies with a white powdery substance on the bed and dresser in the room, as well as a cellular phone and a pager. The officers retreated to the front of the house, called for backup, returned to the side yard and entered the house through the window, whereupon they arrested defendant.

Defendant was charged with possession of a controlled substance (cocaine) for sale. (Health & Saf. Code, § 11351.) He moved to suppress the evidence, relying on *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33] (*Lorenzana*). The trial court denied the motion to suppress, observing: "Well, I think the key to the analysis, the important key, and that's using *Lorenzana*, is the expectation of privacy. [¶] And I don't think there can be an expectation of privacy on the initial threshold because, in looking at this window, even with the lights on, to me, an expectation of privacy is what the defendant in *Lorenzana* had because he had his window really covered and the officer had to get within five to six inches and look through a little, tiny slot. In other words, the window was opaque.

"Here, the window was closed, pretty much. There is nothing covering up the defendant's activity, which is clearly drug-type activity. And the only other question is the intrusion issue. And I don't know whether it's close or not, but the officer was on a legitimate call for a legitimate reason.

"And I think you can probably argue, explicitly, they had a right to try to look to find the music. So I think the key to the defendant's expectation of privacy—I think he gave it away by at least not having the blinds closed. [¶] If, in fact, the blinds were closed—I would look at it differently—and the officer had to go up to the window and peer down and look through a one-inch opening. Just walking by this window you can see fairly well . . . ."

After his suppression motion was denied, defendant pleaded guilty and appealed. (Pen. Code, § 1538.5, subd. (m).) The Court of Appeal reversed.

## DISCUSSION

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." (U.S. Const., 4th Amend.) This guarantee has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states. (See *Mapp v.*

*Ohio* (1961) 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] [federal exclusionary rule applicable to the states].) A similar guarantee against unreasonable government searches is set forth in the state Constitution (Cal. Const., art. I, § 13) but, since voter approval of Proposition 8 in June 1982, state and federal claims relating to exclusion of evidence on grounds of unreasonable search and seizure are measured by the same standard. (*In re Tyrell J.* (1994) 8 Cal.4th 68, 76 [32 Cal.Rptr.2d 33, 876 P.2d 519]; *In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].) "Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court." (*In re Tyrell J., supra,* at p. 76.)[1]

 In reviewing the action of the lower courts, we will uphold those factual findings of the trial court that are supported by substantial evidence. The question of whether a search was unreasonable, however, is a question of law. On that issue, we exercise "independent judgment." (*People v. Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People v. Memro* (1995) 11 Cal.4th 786, 838 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Because the officers lacked a warrant, the People bore the burden of establishing either that no search occurred, or that the search undertaken by the officers was justified by some exception to the warrant requirement. (See *Vale v. Louisiana* (1970) 399 U.S. 30, 34 [90 S.Ct. 1969, 1971-1972, 26 L.Ed.2d 409]; *People v. Rios* (1976) 16 Cal.3d 351, 355 [128 Cal.Rptr. 5, 546 P.2d 293].)

 The "ultimate standard set forth in the Fourth Amendment is reasonableness" (*Cady v. Dombrowski* (1973) 413 U.S. 433, 439 [93 S.Ct. 2523, 2527, 37 L.Ed.2d 706]), and, after *Katz v. United States* (1967) 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (*Katz*), we ask two threshold questions. First,

---

[1]Contrary to the suggestion in the dissent (dis. opn., *post,* at pp. 847-848), for this court to look to our own precedent (i.e., *Lorenzana, supra,* 9 Cal.3d 626) for guidance in Fourth Amendment jurisprudence is not inappropriate, notwithstanding Proposition 8. We are not bound by lower federal court decisions in this area (*In re Tyrell J., supra,* 8 Cal.4th at p. 79; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; see also *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352 [276 Cal.Rptr. 326, 801 P.2d 1077] [same rule for interpreting Prop. 115]), and *Lorenzana* addresses nearly the identical question. Although *Lorenzana* was decided before passage of Proposition 8, it was based expressly on both the federal and state constitutional guarantees against unreasonable searches and seizures (*Lorenzana, supra,* at pp. 631, 641), and thus constitutes a decision by this court on the federal constitutional issue we face in this case. Nothing in *People v. Luttenberger* (1990) 50 Cal.3d 1, 9 [265 Cal.Rptr. 690, 784 P.2d 633], cited by the dissent, suggests we should devalue decisions of this court construing the Fourth Amendment in favor of the views of lower federal courts from around the country merely because our decision was rendered before June 8, 1982, the effective date of Proposition 8. (See Cal. Const., art. I, § 28.)

did the defendant exhibit a subjective expectation of privacy? Second, is such an expectation objectively reasonable, that is, is the expectation that one society is willing to recognize as reasonable? (*Bond v. United States* (2000) 529 U.S. 334, 337-338 [120 S.Ct. 1462, 1464-1465, 146 L.Ed.2d 365, 370] (*Bond*); *California v. Ciraolo* (1986) 476 U.S. 207, 211 [106 S.Ct. 1809, 1811-1812, 90 L.Ed.2d 210] (*Ciraolo*).) ██ Although the trial court's finding on the first point is obscure, we conclude defendant exhibited a subjective expectation of privacy, in that he did not expect people to be intruding onto his private property at 11:00 p.m. and looking into his windows. (Cf. *Bond, supra,* 529 U.S. at p. 337 [120 S.Ct. at p. 1464, 146 L.Ed.2d at p. 369] ["physically invasive inspection is simply more intrusive than purely visual inspection"].) We thus turn to address whether, under all the facts, defendant's expectation of privacy was objectively reasonable.

██ "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." (*United States v. Karo* (1984) 468 U.S. 705, 714 [104 S.Ct. 3296, 3303, 82 L.Ed.2d 530].) Indeed, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Payton v. New York* (1980) 445 U.S. 573, 585 [100 S.Ct. 1371, 1379, 63 L.Ed.2d 639], quoting *United States v. United States District Court* (1972) 407 U.S. 297, 313 [92 S.Ct. 2125, 2134, 32 L.Ed.2d 752].) A central principle of the Fourth Amendment is that a person may "retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman v. United States* (1961) 365 U.S. 505, 511 [81 S.Ct. 679, 683, 5 L.Ed.2d 734, 97 A.L.R.2d 1277].)

Balanced against this solicitude for privacy in the home is the need for effective law enforcement. Thus, "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. [Citation.] 'What a person knowingly exposes to the public, even in his own home . . . , is not a subject of Fourth Amendment protection.' " (*Ciraolo, supra,* 476 U.S. at p. 213 [106 S.Ct. at pp. 1812-1813], quoting *Katz, supra,* 389 U.S. at p. 351 [88 S.Ct. at p. 511].)

██ Officers Wood and Mora were not, of course, standing on a public thoroughfare when they observed defendant packaging cocaine; they were in his yard. Nevertheless, their observations would not constitute a search (in

the constitutional sense) and thus not violate the Fourth Amendment if they were standing in a place where they otherwise had a right to be. (*Ciraolo, supra*, 476 U.S. at p. 213 [106 S.Ct. at pp. 1812-1813].) This case thus turns on whether Officers Wood and Mora were legally entitled, under all the circumstances, to be in defendant's side yard.

We addressed this precise point in *Lorenzana, supra*, 9 Cal.3d 626. In that case, the police, responding to an anonymous tip about drug dealing at the defendant's home, went into the side yard of his house. As here, the side yard was an otherwise barren, grass-covered patch of land bearing neither a fence, gate, landscaping nor a path to indicate that the public was expressly or implicitly invited in. Unlike in this case, when the investigating police officer in *Lorenzana* entered the side yard, he found the window largely obscured by drawn curtains. Undeterred, he crouched down and looked through a two-inch gap between the curtains and the windowsill, but could not see into the room until his face was five or six inches from the window. The officer watched and listened for 15 minutes; in this manner, he acquired evidence of drug dealing and made the arrest.

In issuing a writ to reverse the denial of a suppression motion, Justice Tobriner, writing for the court, relied principally on the fact the officer had trespassed on the defendant's property and thus, when he observed the evidence of criminality, he was not standing on property that had been expressly or impliedly opened to the public. "[Past cases] clearly demonstrate the salutary rule of law that observations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful unless executed pursuant to a warrant or one of the established exceptions to the warrant requirement." (*Lorenzana, supra*, 9 Cal.3d at p. 634, fn. omitted.)

■ "[A] resident of a house [may] rely justifiably upon the privacy of the surrounding areas as a protection from the peering of the officer unless such residence is 'exposed' to that intrusion by the existence of public pathways or other invitations to the public to enter upon the property. This justifiable reliance on the privacy of the non-common portions of the property surrounding one's residence thus leads to the particular rule that searches conducted without a warrant from such parts of the property always are unconstitutional unless an exception to the warrant requirement applies." (*Lorenzana, supra*, 9 Cal.3d at p. 638, italics omitted; see 1 LaFave, Search and Seizure (3d ed. 1996) Protected Areas and Interests, § 2.3(c), pp. 480 & fn. 65, 485-486 [citing *Lorenzana* with approval].)

Defendant argues *Lorenzana* controls this case, while respondent and the dissent contend *Lorenzana* is distinguishable on its facts. Although we find slight factual differences between *Lorenzana* and the instant case, none implicate the core holding of *Lorenzana*, to wit, that observations by law enforcement officers intrude on a person's reasonable expectation of privacy if made from private property onto which neither the public nor the police has been invited, and in circumstances wherein police lack a legal justification for being on the property.

Respondent and the dissent emphasize that, unlike in *Lorenzana*, Officers Wood and Mora did not peer into a small opening or aperture in the curtains to intrude on defendant's privacy. Instead, defendant's rather large (four- by eight-foot) window was completely uncovered, so that any person in the side yard could easily have viewed his unlawful activity. From this circumstance, respondent and the dissent would have us conclude defendant failed to exhibit an expectation of privacy that was reasonable.

Although it is true the officer in *Lorenzana* was forced to peer through a small opening between the drawn curtains and the windowsill to observe the defendant's illegal activity, our decision in that case did not turn on the surreptitious nature of the officer's observation. Instead, *Lorenzana* identified a broader proposition: a warrantless search cannot be justified by police observations "made from a position to which the officer has not been expressly or implicitly invited." (*Lorenzana*, *supra*, 9 Cal.3d at p. 634.)

None of the cases cited by respondent support a contrary conclusion. All either involve the police making observations from a public vantage point (e.g., *People v. Berutko* (1969) 71 Cal.2d 84, 88 [77 Cal.Rptr. 217, 453 P.2d 721] (*Berutko*) [front of apartment building]; *United States v. Hersh* (9th Cir. 1972) 464 F.2d 228, 229 (*per curiam*) [front porch of home]), pose distinguishable facts (*Bielicki v. Superior Court* (1962) 57 Cal.2d 602, 604 [21 Cal.Rptr. 552, 371 P.2d 288] [observation of public toilet stalls from a hole in the ceiling]) or are silent as to whether the police were standing in a place open to the public (*People v. Willard* (1965) 238 Cal.App.2d 292, 297 [47 Cal.Rptr. 734] [police entered open gate, stepped on porch to back door and looked through screen door]; *People v. Martin* (1955) 45 Cal.2d 755, 758 [290 P.2d 855] [police looked through rear window of small office building]).

Thus, while it is certainly true that " 'in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself [does not] draw[] the blinds the occupant could have drawn but did not' " (*Berutko*, *supra*, 71 Cal.2d at p. 93, italics omitted,

quoting *State v. Smith* (1962) 37 N.J. 481, 496 [181 A.2d 761]), that pithy statement was made in the context of an observation by police who were standing in a location to which the public was invited, i.e., the front of an apartment building (*Berutko, supra,* at p. 88). Accordingly, neither *Berutko* nor the other cases respondent cites create an "unshuttered window" exception to the Fourth Amendment's warrant requirement that supersedes *Lorenzana*'s reliance on the fact that police were not entitled to be in the defendant's side yard.

 Nor is it significant, as respondent argues, that Officers Wood and Mora observed defendant for only a short time (perhaps only a minute), whereas the officer in *Lorenzana* watched and listened for 15 full minutes. It is the nature, not the duration, of the intrusion that controls this case. Had Wood and Mora been standing on a public sidewalk, they could have observed defendant for as long as they wished. Conversely, had the officer in *Lorenzana* peered through the small opening in the window for only 60 seconds, he would still have conducted an illegal warrantless search because he was standing on private property onto which he had not been invited.

Respondent and the dissent also argue *Lorenzana* is distinguishable because the officers in that case were directed to the house by a tip of drug dealing, and thus were investigating the very crime they ultimately discovered. By contrast, Officers Wood and Mora were investigating a noise complaint, had not targeted defendant's house for surveillance, and only by accident—characterized by the dissent in the Court of Appeal as a "luck out arrest"—discovered defendant packaging cocaine.

That police had not targeted defendant's house for an investigation into drug dealing, and only inadvertently discovered him engaging in that crime, does not change the fact that police acquired the evidence of his crime by watching him through a window from a vantage point to which neither they nor the public had been invited. The relevance of police motive was raised in *Ciraolo, supra,* 476 U.S. 207, where the defendant suggested the fact police were in a public airspace when they viewed the marijuana plants in his yard was insufficient to compromise his expectation of privacy when "the viewing is motivated by a law enforcement purpose, and not the result of a casual, accidental observation." (*Id.* at p. 212 [106 S.Ct. at p. 1812].)

The high court accorded no weight to the police officer's motive, relying solely on the fact the officer's vantage point was open to the public. "That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant. . . . Any member of the public flying in this airspace who glanced down could have seen

everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor." (*Ciraolo, supra*, 476 U.S. at pp. 213-214 [106 S.Ct. at p. 1813], fn. omitted.) Similarly, we fail to see why the fact that Officers Wood and Mora entered defendant's side yard for reasons unrelated to seeking evidence of drug sales should be relevant to determining the reasonableness of defendant's expectation of privacy.[2]

Respondent contends that Officers Wood and Mora's observations were constitutionally permissible because "nothing prohibited access to and from [the] side yard from the street along the side of the house." We might add that, from the photographs of the scene included in the record, one might expect that at some point, a neighbor's child, should the need arise, might retrieve an errant ball or loose pet from the side yard of defendant's home. Similarly, an employee of the local utility company might at some point enter the yard to read the meter, were one located there. Admittedly there was no fence, no sign proclaiming "No trespassing," no impediment to entry.

Nevertheless, we cannot accept the proposition that defendant forfeited the expectation his property would remain private simply because he did not erect an impregnable barrier to access. Recalling that the lodestar of our inquiry is the reasonableness of defendant's expectation of privacy, we assume for the sake of argument the meter reader or the child chasing a ball or pet may have implied consent to enter the yard for that narrow reason, for a limited time, and during a reasonable hour. Certainly the same cannot be said for the unconsented-to intrusion by police at 11:00 o'clock at night. (See Pen. Code, § 647, subd. (i) [a person commits misdemeanor of disorderly conduct "[w]ho, while loitering, prowling, or wandering upon the private property of another, at any time, peeks in the door or window of any inhabited building or structure, without visible or lawful business with the owner or occupant"]; see also *Bond, supra*, 529 U.S. at pp. 337-338 [120 S.Ct. at pp. 1464-1465, 146 L.Ed.2d at p. 370] [placing one's baggage in the overhead compartment in a bus, where other passengers may touch and move it, does not relinquish the expectation of privacy in the bag's contents, such that police may feel the bag in an exploratory manner to try and determine its contents].)

---

[2]In addition, respondent contends " 'suppression of the evidence here would contribute nothing to the goals of deterring police misconduct.' " (Quoting *People v. Little* (1973) 33 Cal.App.3d 552, 557 [109 Cal.Rptr. 196].) We disagree: Suppression of the evidence will tend to discourage police officers from engaging in warrantless nighttime intrusions into the yards of citizens and peering into the private areas of homes when police have no objective evidence of criminal wrongdoing.

That is not to say we find Officers Wood and Mora's search unlawful merely because they were trespassing on defendant's private property.[3] The Supreme Court's decision in *Katz, supra,* 389 U.S. 347, "refused to lock the Fourth Amendment into instances of actual physical trespass." (*United States v. United States District Court, supra,* 407 U.S. at p. 313 [92 S.Ct. at p. 2135]; see also *Ciraolo, supra,* 476 U.S. at p. 223 [106 S.Ct. at p. 1818] (dis. opn. of Powell, J.) ["Since *Katz,* we have consistently held that the presence or absence of physical trespass by police is constitutionally irrelevant to the question whether society is prepared to recognize an asserted privacy interest as reasonable."].) For example, *Katz,* a seminal case in Fourth Amendment jurisprudence, involved wiretapping, an intrusion into privacy not easily amenable to a trespassing analysis. The high court found police invaded that defendant's reasonable expectation of privacy even though they did not trespass on his property.

■ Moreover, even without a warrant, police officers may intrude onto private property if the surrounding facts provide cause to believe an emergency situation exists. ■ Thus, had Wood and Mora been dispatched to defendant's house in response to a report of gunshots being fired, of screams being heard, or of a riot, a stabbing or some other serious crime, we cannot say their entry into the side yard would have been unlawful. Indeed, had the officers on their arrival at defendant's house heard a raucous party, confirming the anonymous complaint that brought them there in the first place, and had they then banged on the front door to no avail, their entry into the side yard in an attempt to seek the source of the noise would likely have been justified.

The facts here paint quite a different picture: Called to investigate a complaint of excessive noise, an infraction under the city's municipal ordinances, the officers arrived at defendant's home late in the evening and heard no such noise. Without bothering to knock on defendant's front door, they proceeded directly into his darkened side yard. Most persons, we believe, would be surprised, indeed startled, to look out their bedroom window at such an hour to find police officers standing in their yard looking back at them.

In short, we find this case is governed by *Lorenzana, supra,* 9 Cal.3d 626. Although *Lorenzana* was decided prior to the enactment of Proposition 8 in

---

[3] We emphasize our decision today is not based on the simplistic notion that police violate a defendant's constitutional rights whenever they commit a technical trespass. Although the dissent attempts to recharacterize our reasoning as resting on this single consideration (dis. opn., *post,* at pp. 840, 841, 845, 846, 851), the attempt fails. As we explain, we balance several factors to conclude police acted unreasonably in this case.

1982, no post-*Lorenzana* decision by the United States Supreme Court casts any doubt on its primary reliance on the public or private nature of the police officer's vantage point as a controlling factor in determining the lawfulness of the officer's warrantless observations of citizens' conduct inside the privacy of their homes. (See *In re Tyrell J.*, *supra*, 8 Cal.4th at p. 79 [Prop. 8 constrains this court to follow Supreme Court decisions; those of lower federal courts are persuasive but not controlling].) Significantly, respondent does not cite any Supreme Court authority requiring we uphold the trial court's denial of defendant's suppression motion.

Nor are we persuaded by the lower federal court decisions cited by the dissent in support. First, none is as close to the facts of this case as *Lorenzana*, *supra*, 9 Cal.3d 626. Second, of those that indicate the site of the observation, most pose distinguishable facts, in that the observations were made from arguably public areas. (*U.S. v. Taylor* (4th Cir. 1996) 90 F.3d 903 [front porch]; *U.S. v. James* (7th Cir. 1994) 40 F.3d 850 [paved walkway along the side of a house]; *U.S. v. Evans* (7th Cir. 1994) 27 F.3d 1219 [driveway].) In short, none of the cited lower federal court cases convince us to abandon our decision in *Lorenzana*.

## CONCLUSION

It is not by coincidence that the Fourth Amendment expressly commands that "[t]he right of the people to be secure *in their . . . houses . . .* shall not be violated." (U.S. Const., 4th Amend., italics added.) The Framers' interest that we remain secure from government intrusion in our homes was a paramount concern. When Officers Wood and Mora peered into defendant's home through his window, they were standing in a place to which neither they nor the public had been invited, and no other circumstances authorized their entry into defendant's yard. Accordingly, defendant retained a reasonable expectation of privacy over his activities, the officers' observation of him was a search within the meaning of the Fourth Amendment, and respondent asserts no satisfactory justification for their dispensing with a warrant.[4]

As noted, if the facts were different, perhaps only slightly so, we might conclude the officers were entitled to enter defendant's yard, thereby validating the lawfulness of their observations of defendant through his bedroom

---

[4]We decline to reach respondent's contention the search was lawful because it occurred in the context of the police officers' " 'community caretaking function[],' " that is, that it involved a proper police activity " 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " (*People v. Ray* (1999) 21 Cal.4th 464, 467 [88 Cal.Rptr.2d 1, 981 P.2d 928] (lead opn. of Brown, J.).) Respondent raised this issue for the first time in this court, making the issue inappropriate for review both because he did not raise it in the Court of Appeal (Cal. Rules of Court, rule 29(b)(1)) and also because it was not raised in the hearing on the suppression motion to justify the officers' warrantless entry onto defendant's property (*People v. Ruggles* (1985) 39 Cal.3d 1, 12, fn. 6

window. The lateness of the hour, the relative lack of seriousness of the phoned-in complaint, and the failure first to knock on defendant's front door, all are relevant to evaluating the reasonableness of the officers' conduct in this case. We cannot say, however, that the officers, having arrived at defendant's house close to midnight in response to an anonymous complaint of a loud party and perceiving nothing amiss, were entitled to enter defendant's private property without a warrant and look through his windows. To the contrary, we find defendant's expectation that no one would be in his side yard so late at night was a reasonable one.

Finally, although the line we draw today lets an unquestionably guilty man go free, we observe that "constitutional lines have to be drawn, and on one side of every one of them is an otherwise sympathetic case that provokes impatience with the Constitution and with the line. But constitutional lines are the price of constitutional government." (*Agostini v. Felton* (1997) 521 U.S. 203, 254 [117 S.Ct. 1997, 2026, 138 L.Ed.2d 391] (dis. opn. of Souter, J.).)

The decision of the Court of Appeal is affirmed.

Mosk, J., Kennard, J., and Brown, J., concurred.

**BROWN, J.**—I fully concur in the determination to affirm the Court of Appeal's judgment reversing the denial of defendant's suppression motion.

I write separately because although the "two threshold questions" (maj. opn., *ante*, at p. 830) derived from Justice Harlan's concurring opinion in *Katz v. United States* (1967) 389 U.S. 347, 360 [88 S.Ct. 507, 516, 19 L.Ed.2d 576], may confirm that the majority reaches the correct result in this case, this reference should not be read to imply that Fourth Amendment analysis invariably proceeds from a determination "first [whether] a person [has] exhibited an actual (subjective) expectation of privacy and, second, [whether] the expectation be one that society is prepared to recognize as 'reasonable.'" (*Id.* at p. 361 [88 S.Ct. at p. 516] (conc. opn. of Harlan, J.).) This formula does not serve as an all-purpose or universally applicable template for assessing every challenged search or seizure. (See Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn. L.Rev. 349, 385.) Rather, its utility is generally limited to issues concerning whether the place searched or the manner in which police officers conducted the search gave rise to an infringement of the defendant's right to be free of unreasonable governmental intrusions. (See, e.g., *Bond v. United States* (2000) 529 U.S.

[216 Cal.Rptr. 88, 702 P.2d 170]; *Mestas v. Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977]).

334, 338 [120 S.Ct. 1462, 1465, 146 L.Ed.2d 365] [manipulation of defendant's carry-on luggage located in overhead storage space]; *O'Connor v. Ortega* (1987) 480 U.S. 709, 716 [107 S.Ct. 1492, 1497, 94 L.Ed.2d 714] [search of defendant's workplace]; see also *California v. Ciraolo* (1986) 476 U.S. 207, 211 [106 S.Ct. 1809, 1811-1812, 90 L.Ed.2d 210] [plain view observation of defendant's fenced backyard from airplane 1,000 feet overhead not search in constitutional sense]; *Rakas v. Illinois* (1978) 439 U.S. 128, 143 [99 S.Ct. 421, 430, 58 L.Ed.2d 387] [finding *Katz* "provides guidance in defining the scope of the interest protected by the Fourth Amendment" for purposes of determining whether defendant may contest search or seizure]; see generally 1 LaFave, Search and Seizure (3d ed. 1996) Protected Areas and Interests, § 2.1, pp. 375-395.)

Outside this context, the analytical framework articulated in *Katz* may not always yield results consistent with Fourth Amendment guarantees. For example, in *In re Tyrell J.* (1994) 8 Cal.4th 68 [32 Cal.Rptr.2d 33, 876 P.2d 519], involving a search of the defendant's person, the majority's invocation of the *Katz* two-part inquiry led to the conclusion that because the defendant was a juvenile probationer subject to a search condition, he therefore had no reasonable expectation of privacy. Thus, the officer's ignorance of the condition when he searched was of no constitutional moment. (*Id.* at pp. 83-86; see also *In re Marcellus L.* (1991) 229 Cal.App.3d 134, 145 [279 Cal.Rptr. 901].) Whether, as characterized by Professor LaFave, this reasoning is "bizarre" (4 LaFave, Search and Seizure, *supra*, Inspections § 10.10(e), p. 792), it is certainly constitutionally suspect. (See *In re Tyrell J.*, *supra*, 8 Cal.4th 69, 90-99 (dis. opn. of Kennard, J.); see generally *People v. Woods* (1999) 21 Cal.4th 668, 692-696 [88 Cal.Rptr.2d 88, 981 P.2d 1019] (dis. opn. of Brown, J.); see also Comment, *Fourth Amendment Protection for Juvenile Probationers in California, Slim or None?: In re Tyrell J.* (1995) 22 Hastings Const. L.Q. 893.)

Moreover, as this case illustrates, even when a case involves the search of a place, the *Katz* approach may be entirely unnecessary to determine whether it was reasonable under the Fourth Amendment. As the majority acknowledges, "We addressed this precise point in *Lorenzana* [*v. Superior Court* (1973)] 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33]." (Maj. opn., *ante*, at p. 832.) In *Lorenzana*, the court resolved the question on the well-established principle that the lawfulness of an officer's plain view observations depends upon whether he made them from a place where he had the right to be.[1] (*Lorenzana*, *supra*, 9 Cal.3d at pp. 631-636; see, e.g., *Horton v. California*

---

[1] Only after this discussion did we note that our holding "conforms to the reasoning of the United States Supreme Court's definitive decision in *Katz* v. *United States*[, *supra*,] 389 U.S. 347." (*Lorenzana v. Superior Court*, *supra*, 9 Cal.3d at p. 637.)

(1990) 496 U.S. 128, 136 [110 S.Ct. 2301, 2307-2308, 110 L.Ed.2d 112]; *California v. Ciraolo, supra*, 476 U.S. at p. 213 [106 S.Ct. at pp. 1812-1813].) On the present facts, this analysis is more than adequate to determine whether the officers acted lawfully.

**GEORGE, C. J.**—I respectfully dissent.

This case presents the question whether the Fourth Amendment mandates the suppression of evidence obtained when law enforcement officers, in responding to a late-night complaint of unduly loud noise at a residence and attempting to ascertain the location from which the noise emanated, entered a shallow, unenclosed side yard adjacent to the residence and observed—through a large, completely uncovered first-story window—criminal activity within the residence. The trial court determined that the evidence should not be suppressed, but a majority of this court disagrees, concluding that because there was no sidewalk or pathway implicitly inviting the public to enter the side yard, the police officers observed defendant's activity from a place where they assertedly "had no legal right to be" (maj. opn., *ante*, at p. 828) and, as a consequence, that the actions of the police constituted an unlawful search.

Although the majority insists that its determination that the officers' conduct violated defendant's constitutional rights is not based "merely [on the circumstance that the officers] were trespassing on defendant's private property" (maj. opn., *ante*, at p. 836), the majority's holding can be rationalized only through an inflexible application of trespass doctrine rather than under the "reasonable expectation of privacy" standard that properly governs the application of the Fourth Amendment's proscription against unreasonable searches and seizures. In view of the location and configuration of defendant's residence, the open and easily accessible nature of the side yard, the large (eight-by-four-foot) uncovered window facing the side yard, and defendant's failure to take even minimal measures—such as shielding the window with curtains, blinds, or even a makeshift cover—that would have been taken by a reasonable person concerned with protecting his or her privacy, I believe the trial court properly found that defendant lacked a reasonable expectation of privacy with regard to activities that were plainly visible through the uncovered window. Further, in view of the factual circumstances of the present case, I believe that the trial court properly concluded that the brief time spent by the officers in the open side yard of the residence, not for the purpose of surveillance but simply to attempt to identify the location of the noise that had prompted the complaint to the police, was not unreasonable under the circumstances.

In resting its conclusion largely on the circumstance that the police officers observed defendant's criminal conduct from "a place they had no

legal right to be" (maj. opn., *ante*, at p. 828), the majority ignores the teaching of a number of recent federal decisions that have recognized that "legitimate police business may occasionally take officers to parts of the premises not ordinarily used by visitors" (1 LaFave, Search and Seizure (3d ed. 1996) Protected Areas and Interests, § 2.3(f), p. 509, citing cases), and that "[t]he ultimate focus of Fourth Amendment analysis [is not whether police conduct amounts to a trespass, but] whether the defendant had a reasonable expectation of privacy in the place searched." (*U.S. v. Fields* (2d Cir. 1997) 113 F.3d 313, 322.) As these cases demonstrate, because defendant failed to take even minimal steps to shield his actions from being viewed from an area where he could reasonably anticipate that a neighbor or other member of the public might venture, the police conduct here did not infringe upon a reasonable expectation of privacy and, consequently, suppression of the evidence is not warranted.

Thus, in light of the straightforward nature of the factual setting presented, this case might well provide the United States Supreme Court with an appropriate opportunity to clarify the proper relationship between trespass principles and the reasonable-expectation-of-privacy test under the Fourth Amendment of the United States Constitution.

## I.

In considering whether challenged police conduct violates the Fourth Amendment, the threshold question a court must address is whether the police conduct amounted to a search or seizure, because not every observation made by a law enforcement officer constitutes a "search" within the meaning of the Fourth Amendment. (*Illinois v. Andreas* (1983) 463 U.S. 765, 771 [103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003].) As the United States Supreme Court has explained: "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." (*United States v. Jacobsen* (1984) 466 U.S. 109, 113 [104 S.Ct. 1652, 1656, 80 L.Ed.2d 85]; see also *Illinois v. Andreas, supra,* 463 U.S. at p. 771 [103 S.Ct. at p. 3324] ["If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' . . . ."].)

As the majority correctly observes, individuals ordinarily possess the highest expectation of privacy within their homes, an area that typically is "afforded the most stringent Fourth Amendment protection." (*United States v. Martinez-Fuerte* (1976) 428 U.S. 543, 561 [96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116].) But the circumstance that defendant was located within his residence when the police officers observed him is not itself sufficient to render the observation a search for Fourth Amendment purposes, because, as

the United States Supreme Court has noted, "[w]*hat a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection.*" (*Katz v. United States* (1967) 389 U.S. 347, 351 [88 S.Ct. 507, 511, 19 L.Ed.2d 576], italics added; see also *California v. Greenwood* (1988) 486 U.S. 35, 41 [108 S.Ct. 1625, 1629, 100 L.Ed.2d 30] ["the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public"]; *U.S. v. Garcia* (9th Cir. 1993) 997 F.2d 1273, 1279 [there is "no search, and hence no Fourth Amendment violation, . . . when officers observed criminal activity with the naked eye from a vantage point accessible to the general public"].)

Recently, in *Bond v. United States* (2000) 529 U.S. 334, 338 [120 S.Ct. 1462, 1465, 146 L.Ed.2d 365], the United States Supreme Court held: "Our Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.' [Citation.] . . . Second, we inquire whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.' [Citation, fn. omitted.]"

In the present case, defendant is unable to satisfy either prong of the *Bond* analysis. By engaging in criminal activity behind a large, completely uncovered window that was located on the ground floor of his residence and that faced a shallow side yard open to, and easily accessible from, the public sidewalk and street, his conduct failed to exhibit an actual expectation of privacy. The photographs contained in the record (and attached as an appendix to this opinion) make clear that the side yard in question was not designed to, and did not in fact, provide any significant degree of privacy. There were no fences, bushes, or other shrubbery to hinder or deter entry from the sidewalk or street. Nor was defendant's expectation of privacy a reasonable one. Because of the location and openness of the yard, one reasonably could anticipate that neighbors or other members of the public occasionally would enter the yard, for example to retrieve a ball, toy, bicycle, or pet. In view of the urban setting and the configuration of the side yard and the window, I believe the trial court properly found that defendant lacked a reasonable expectation of privacy with regard to activities that could be viewed through the window, either by a neighbor who happened to enter the yard briefly for such a common purpose or by police who might enter the yard briefly to investigate a complaint.

Although the United States Supreme Court has yet to render a decision directly on point regarding a factual situation similar to the one presented

here, a number of lower federal court decisions addressing analogous circumstances have concluded that when a defendant has conducted activities in plain view of an area to which other persons (e.g., cotenants or members of the public) have access and reasonably can be expected to visit at least occasionally, without the defendant's taking reasonable steps to shield his or her activities from such view, police observations of the defendant's activities do not infringe upon a reasonable expectation of privacy and therefore do not violate the Fourth Amendment. Although we are not bound by the decisions of the lower federal courts, "they are persuasive and entitled to great weight." (*People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) Inexplicably, however, the majority pays scant attention to these decisions. (See, e.g., *U.S. v. Fields, supra,* 113 F.3d 313 [no search where police officers entered fenced-in side yard of apartment house and looked through five- to six-inch gap below venetian blinds into defendant's illuminated bedroom, because defendant's activity was deemed to be in plain view of a common area accessible to other tenants]; *U.S. v. Taylor* (4th Cir. 1996) 90 F.3d 903, 908-909 [not a search for officer to look through picture window located on front porch of defendant's residence]; *U.S. v. James* (7th Cir. 1994) 40 F.3d 850, 861-862 [no search where police officer used a paved walkway along the side of the duplex leading to the rear side door, observing contraband on the table through the dining room window]; *U.S. v. Evans* (7th Cir. 1994) 27 F.3d 1219, 1228-1229 [looking into the defendant's house from driveway did not constitute a search, because there was no evidence that the public's access to the defendant's driveway was limited]; *U.S. v. Garcia, supra,* 997 F.2d at pp. 1279-1280 [upholding entrance onto back porch of apartment]; *U.S. v. Daoust* (1st Cir. 1990) 916 F.2d 757, 758 [police officers, who found the front door of the defendant's house inaccessible, did not violate the Fourth Amendment when they proceeded to the rear, in search of another entrance]; *United States v. Ventling* (8th Cir. 1982) 678 F.2d 63, 66 [no reasonable expectation of privacy in driveway and area around front porch, where observations were made in public view]; *United States v. Wheeler* (9th Cir. 1981) 641 F.2d 1321, 1327 [defendant "diminished his legitimate expectation of privacy" by failing to cover a gap of one inch between a solid six-foot wooden fence and garage wall]; *United States v. Johnson* (D.C. Cir. 1977) 561 F.2d 832, 835 [182 App. D.C. 383] [acting upon an anonymous tip regarding the presence of illegal narcotics within a residence, a police officer veered a few feet from the walkway that led to the front door, and peered from the adjacent grassy area through an unobstructed window]; *United States v. Anderson* (8th Cir. 1977) 552 F.2d 1296, 1298-1300 [following the unanswered knock of federal agents at the front door, the agents walked along the side of the house and, glancing through a partially covered basement window, discovered numerous stolen television sets]; *United States v. Conner* (7th Cir. 1973) 478 F.2d 1320, 1323 [emphasizing that even if the police officer's observations were made from the

concrete apron outside the rear door of the defendant's garage, the apron abutted a public alley and therefore the defendant had no reasonable expectation of privacy]; see also 1 LaFave, Search and Seizure, *supra*, Protected Areas and Interests, § 2.3(f), p. 509 ["*[L]egitimate police business may occasionally take officers to parts of the premises not ordinarily used by visitors.*" (Fn. omitted, italics added.)]; but see *State of Texas v. Gonzales* (5th Cir. 1968) 388 F.2d 145, 147 [police have no right to look through window simply to see if drug activity is taking place]; *People of State of California v. Hurst* (9th Cir. 1963) 325 F.2d 891, 893, 898 [in response to an anonymous tip regarding the illegal possession of marijuana, police officer who "peered through" a bathroom window on the side of the defendant's residence held to have unlawfully invaded the defendant's privacy]; *Brock v. United States* (5th Cir. 1955) 223 F.2d 681, 685 [in the course of investigating an illicit still, federal revenue agents improperly appeared outside the defendant's bedroom window]; *United States v. Johnson, supra,* 561 F.2d 832, 847 (conc. opn. of Leventhal, J.) ["In my view while Fourth Amendment protection would not extend to observations by persons using the paved way from the sidewalk to the door of the house, it would likely extend to evidence obtained by walking onto the lawn around the house and then peering into windows" (fn. omitted)].)

Many of the federal court decisions cited above involve observations from front or back porches or paved paths to which the public had been implicitly invited (see, e.g., *U.S. v. Taylor, supra,* 90 F.3d 903 [front porch]; *U.S. v. James, supra,* 40 F.3d 850 [paved walkway]; *U.S. v. Garcia, supra,* 997 F.2d 1273 [back porch]; and *U.S. v. Daoust, supra,* 916 F.2d 757 [back of the house]), but in other instances the observations were made from other areas of the premises that were not implicitly open to the public but as to which cotenants or other members of the public foreseeably might enter. (See, e.g., *U.S. v. Fields, supra,* 113 F.3d 313 [observation made from fenced-in side yard accessible to cotenants]; *U.S. v. Evans, supra,* 27 F.3d 1219 [observation made from driveway]; *United States v. Johnson, supra,* 561 F.2d 832 [observation made from a location a short distance from walkway]; *United States v. Anderson, supra,* 552 F.2d 1296 [observation made from side of house]; *United States v. Conner, supra,* 478 F.2d 1320 [observation made from unfenced "apron" adjoining public alley]; *United States v. Wheeler, supra,* 641 F.2d 1321 [observations made through and over yard fence].) These cases conclude that when a defendant has not taken reasonable steps to shield his or her conduct from observation from a location where the defendant reasonably could anticipate that others might be present, the defendant does not harbor a reasonable expectation of privacy, and that police discovery of illegal conduct from such a location does not constitute an unconstitutional search or seizure *even if the police entry into the location*

*amounts to a technical trespass.* (See, e.g., *U.S. v. Fields, supra,* 113 F.3d 313.)

The reasoning in *U.S. v. Fields, supra,* 113 F.3d 313, is particularly instructive. In that case, the defendants used a ground-floor apartment to prepare crack cocaine. A known and reliable informant contacted the police to inform them of the defendants' activities. Believing that there was insufficient time to obtain a search warrant, the police officer who received the tip assembled a team of investigators to visit the apartment. Upon their arrival, the officers were unable to see into the windows of the apartment from the public sidewalk or street. The officers therefore entered a fenced-in rear yard and then a fenced-in side yard in order to facilitate their view into the building. At the rear of the side yard, the officers found a window covered with venetian blinds, save for a five- to six-inch gap beneath the blinds. Upon looking in, the officers saw the defendants packaging what appeared to be crack cocaine. The officers ultimately forced open the locked back door with a battering ram and arrested the men. After obtaining a search warrant, the officers seized more than 400 grams of crack cocaine from the apartment.

In rejecting the defendants' contention that the evidence should have been suppressed, the Second Circuit observed in *Fields*: "In the case at hand defendants conducted their illegal activities in plain view of a bedroom window facing onto the side yard—a common area accessible to the other tenants in the multi-family apartment building—in which they had no legitimate expectation of privacy. [Citation.] Although there was a plainly visible five-to six-inch gap beneath the venetian blinds, defendants took no steps to close it. Their illegal activities, conducted in a well-lit room after dark, could therefore readily be seen by anyone standing in the side yard. [¶] . . . Although police observations made when trespassing are usually improper, it is not the trespass itself which renders them unlawful. Instead, such observations generally violate Fourth Amendment rights simply because those observed cannot reasonably anticipate observation from vantage points obtained by trespassing. In such circumstances, society frequently respects as reasonable the expectation that such observations will not occur. The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched. [(*Katz v. United States, supra,* 389 U.S. 347, 360 [88 S.Ct. 507, 516] (conc. opn. of, Harlan, J.).)] Here, by conducting their activities in plain view of an area where others were free to come and go, defendants failed to demonstrate such an expectation. [¶] . . . [¶]

"In sum, although the defendants could easily have shielded their activities from public view, they failed to take the simple and obvious steps

necessary to do so. By exposing their illicit cocaine activities to the side yard—a place where they should have anticipated that other persons might have a right to be—defendants failed to exhibit a subjective expectation that they intended their dealings in the bedroom to be private. Hence, the police observations did not violate defendants' Fourth Amendment rights. . . ." (*U.S. v. Fields, supra,* 113 F.3d at pp. 321-322; see also *United States v. Conner, supra,* 478 F.2d 1320, 1323 [emphasizing that even if the police officer's observations were made from the concrete apron outside the rear door of the defendant's garage, the apron abutted a public alley and therefore the defendant lacked any reasonable expectation of privacy].)

The foregoing cases, determining that police conduct does not necessarily violate the Fourth Amendment even if such conduct constitutes a trespass, are consistent with numerous United States Supreme Court decisions that have "*emphatically rejected the notion that 'arcane' concepts of property law ought to control . . . the protections of the Fourth Amendment.*" (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 105 [100 S.Ct. 2556, 2562, 65 L.Ed.2d 633], italics added; *Katz v. United States, supra,* 389 U.S. 347; accord, *United States v. Conner, supra,* 478 F.2d 1320, 1323 ["Even if the officers were on the apron, which was not fenced off from the alley, we think that a mere 'technical trespass' did not transform an otherwise reasonable investigation into an unreasonable search."]; *People v. Bradley, supra,* 1 Cal.3d at p. 84 [observing that the *Katz* analysis is superior to those cases in which a conclusion is reached based upon whether the place was a constitutionally protected area].) Instead, the critical inquiry is whether the police conduct improperly intrudes upon an expectation of privacy that society is prepared to consider as reasonable. (*Bond v. United States, supra,* 529 U.S. at p. 338 [120 S.Ct. at p. 1465].) I believe the relevant precedents establish that when, as here, a person fails to take even minimal measures to shield his or her activities from casual observation from a location so open to, and readily accessible by, the public, police observation from such a location does not intrude upon a reasonable expectation of privacy and thus does not violate the Fourth Amendment. (Accord, *State v. Smith* (1962) 37 N.J. 481, 496 [181 A.2d 761, 769] ["[W]e cannot say that in striking a balance between the rights of the individual and the needs of law enforcement, the Fourth Amendment itself draws the blinds the occupant could have drawn but did not"].)

## II.

The Fourth Amendment's guarantee against unreasonable searches and seizures is echoed in article I, section 13, of our state Constitution. Prior to the California electorate's passage of Proposition 8 in June of 1982, the

validity of a government search could be determined on independent state grounds. Proposition 8 added section 28, subdivision (d), to article I of the California Constitution. That section states, in part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ." Proposition 8 thus abrogated a defendant's right to object to, and move to suppress, evidence seized in violation of the California, but not the federal, Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744].) As a result, state and federal claims relating to the exclusion of evidence on the basis of unreasonable search and seizure now are reviewed under the same standard, and a court may exclude evidence challenged on the basis that it was obtained as a result of an unreasonable search or seizure "only if exclusion is also mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment." (*Id.* at pp. 886-887, 896.) As stated by the majority, " 'Our state Constitution thus forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court.' " (Maj. opn., *ante,* at p. 830.)

Unfortunately, the United States Supreme Court has yet to address the precise sort of factual scenario presented here, involving a routine, nonexigent investigation conducted by law enforcement officers in response to a legitimate request for assistance. Accordingly, in the wake of Proposition 8, the proper alternative for this court is to look to the lower federal courts for guidance. (See *People v. Luttenberger* (1990) 50 Cal.3d 1, 9 [265 Cal.Rptr. 690, 784 P.2d 633] ["Thus, California courts now must follow *federal* exclusionary principles in resolving motions to suppress evidence in criminal trials" (italics added)].) As noted previously, although the decisions rendered by the lower federal courts are not binding upon this court, "they are persuasive and entitled to great weight." (*People v. Bradley, supra,* 1 Cal.3d at p. 86.) Rather than look to these federal decisions, however, the majority relies heavily on this court's *pre*-Proposition 8 decision in *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33] (*Lorenzana*). Even *Lorenzana,* however, is clearly distinguishable from this case.

In *Lorenzana,* law enforcement officers received information from a confidential reliable informant that an individual was selling heroin from a residence located in Los Angeles. An officer was dispatched to investigate the allegation, traversed a grassy area adjacent to the residence, and stationed himself within a few inches of a side window. The window was closed and the window shade drawn, but a gap of approximately two inches

remained between the bottom of the shade and the windowsill. Standing there for approximately 15 minutes, the officer overheard an incriminating telephone conversation emanate from within the residence, and observed the defendant empty the powdery contents of a balloon onto a newspaper. Subsequently, in reliance upon the information so obtained, law enforcement officers arrested the defendant and a buyer. (*Lorenzana, supra,* 9 Cal.3d at pp. 629-631.)

These two suspects in *Lorenzana* moved to suppress the evidence on the grounds that the arresting officers had not obtained a warrant, that no exception to the warrant requirement applied, and that the officers did not make their observations from a position to which they were explicitly or implicitly invited. We framed the issue presented as follows: "The crucial question we face here is whether a citizen may properly be subjected to the peering of the policeman who, without a search warrant, walks over ground to which the public has not been invited but which has been reserved for private enjoyment, stands by a window on the side of a house and peeks through a two-inch gap between the drawn window shade and the sill, and thus manages to observe the conduct of those within the residence." (*Lorenzana, supra,* 9 Cal.3d at p. 629.)

In answering the foregoing inquiry in the negative, we emphasized in *Lorenzana* that "[t]he fact that apertures existed in the window, so that an unlawfully intruding individual so motivated could spy into the residence, does not dispel the reasonableness of the occupants' expectation of privacy. [Citations.] To the contrary, the facts of this case demonstrate that *by drawing the window shade petitioner Lorenzana exhibited a reasonable expectation to be free from surveillance* conducted from a vantage point in the surrounding property not open to public or common use. Surely our state and federal Constitutions and the cases interpreting them foreclose a regression into an Orwellian society in which a citizen, in order to preserve a modicum of privacy, would be compelled to encase himself in a light-tight, air-proof box. The shadow of 1984 has fortunately not yet fallen upon us." (*Lorenzana, supra,* 9 Cal.3d at pp. 636-637, italics added.)

The court in *Lorenzana* concluded: "In sum, the prying policeman, clandestinely peering through a two-inch aperture between drawn blinds and windowsill, standing upon trespassed property over which the public has not been expressly or impliedly invited, portrays a sorry figure who violates his subject's right of privacy—a right protected by the California and United States Constitutions and precious to a free and open society." (*Lorenzana, supra,* 9 Cal.3d at p. 641; accord, *U.S. v. Blount* (5th Cir. 1996) 98 F.3d 1489, 1495 ["We conclude and hold that when a police officer walks into the

partially fenced backyard of a residential dwelling, using a passage not open to the general public, *and places his face within inches of a small opening in an almost completely covered rear window to look into the house* and at the inhabitants, that officer has performed a 'search' within the meaning of the Fourth Amendment." (Italics added.)].)

In contrast to the defendant's conduct in *Lorenzana*—drawing the blinds to cover the window—which allowed the police officer to make his observations only by peering through a small aperture between the bottom of the blinds and the windowsill, here defendant left a large window completely uncovered. Because the window was located on a small side yard that was open to, and easily accessible from, the public sidewalk (with no fences, shrubbery, or signs to deter entry), the trial court properly found that defendant here, unlike the defendant in *Lorenzana, supra,* 9 Cal.3d 626, lacked a reasonable expectation of privacy with regard to activities that readily could be viewed through the window by a neighbor or other member of the public who happened to enter the yard briefly for an innocuous purpose. (See, e.g., *U.S. v. Taylor, supra,* 90 F.3d at p. 909 [noting that the absence of a fence or signage prohibiting trespassing could be considered in determining whether the defendant had a reasonable expectation of privacy]; *U.S. v. Evans, supra,* 27 F.3d at p. 1229 [in the absence of evidence that the public had limited access to the driveway of the residence, the defendant had no reasonable expectation that members of the public or law enforcement agents would refrain from entering the driveway area]; compare *California v. Ciraolo* (1986) 476 U.S. 207, 211 [106 S.Ct. 1809, 1811-1812, 90 L.Ed.2d 210] [observing that the placement of a 10-foot fence concealing a marijuana crop from "normal sidewalk traffic" indicated that the defendant "took normal precautions to maintain his privacy"].)

Furthermore, I note that in *Lorenzana*, the police entered the defendant's property for the purpose of surveillance and remained at the suspect's window for 15 minutes, observing and listening to activities conducted within the residence. Under those circumstances, which this court described as involving "the prying policeman, clandestinely peering through a two-inch aperture between drawn blinds and windowsill" (*Lorenzana, supra,* 9 Cal.3d at p. 641), the infringement upon the defendant's expectation of privacy was significantly greater than that presented here. By contrast, in the case now before us, the police, responding to a complaint of unduly loud noise, simply entered the side yard briefly to ascertain the source of the noise, and not for the purpose of conducting the sort of extended surveillance activities seen in *Lorenzana.* Bearing in mind the lateness of the nighttime hour (approximately 11:00 p.m.) and the concomitant reduction in the ability of the police officers to discern potential risks, their actions

appear to exhibit prudence rather than a predisposition to pry. After the officers arrived, they heard "noise coming from the side of the house or to the rear of the house" and decided briefly to ascertain its source. The testifying officer stated that he did not knock on the front door, because "We were trying to determine at that point where the music was coming from." As a precaution, the officers refrained from remaining together during their investigation: "It was a *safety* decision at that time [for one officer] to stay at the front of the house while [the other officer] walked towards the side." (Italics added.)

As in several of the federal cases noted above, the trial court properly could characterize as reasonable the police officers' action in remaining briefly in the yard under these circumstances, notwithstanding the absence of a warrant or the failure of the officers initially to knock at the front door. (See *U.S. v. James, supra,* 40 F.3d at p. 862, fn. 4 [rejecting the notion that "police officers seeking to interview a person are always required to knock on the front door of a residence before they may approach any other public means of access to the dwelling"].) The circumstance that, while so engaged, the officers happened to observe criminal activity occurring within the residence was primarily a consequence of *defendant's decision not to take any protective steps* directed toward ensuring the privacy of his illegal activities.

The majority's conclusion, relying heavily upon *Lorenzana,* that the police officers' conduct in this case was illegal (because the officers "were standing in a place to which neither they nor the public had been invited" [maj. opn., *ante,* at p. 837]), readily may lead to unintended, illogical results in other cases similar to this one. For example, if the side yard had been *marked* with a walkway, but that path was *obstructed* by a motor vehicle, compelling the officers to traverse the yard, should we uphold the officers' conduct in that scenario, simply because the current or previous owner had, at one time, constructed a pathway of some sort? Similarly, *if a pathway existed but could not be discerned* because it was overgrown with weeds (as is the side yard depicted in the photographic exhibits attached as an appendix to this opinion), should we uphold the officers' conduct even though the appearance of the side yard generally was similar to that encountered by the investigating officers here? If such a path existed, and could be discerned, *but was blocked by a gate,* would the analysis turn on whether the gate was locked or unlocked, tall or short, open or shut? Should there be one rule for daylight visits by the police, and another for investigations conducted after dark when pathways might be difficult, if not impossible to see?

These questions are not merely rhetorical; they suggest that arbitrary factual variables—such as a resident's laziness in failing to mow a lawn or

close a gate—might alter the result under the analysis favored by the majority. The application of a rule of constitutional dimension should not depend upon such fortuitous circumstances. Yet, the majority explains, without providing meaningful guidance to police officers, that "if the facts were different, perhaps only slightly so, we might conclude the officers were entitled to enter defendant's yard, thereby validating the lawfulness of their observations of defendant through his bedroom window." (Maj. opn., *ante*, at pp. 837-838.)

I believe that in view of the circumstances encountered by the summoned officers, the trial court properly found that the present case is distinguishable from *Lorenzana*, and that the conduct of the police did not amount to an unconstitutional search under the Fourth Amendment.

### III.

In the wake of Proposition 8, discussed earlier in this dissenting opinion, California courts are required to follow federal exclusionary principles in resolving motions to suppress evidence in criminal trials. (*People v. Luttenberger, supra*, 50 Cal.3d 1, 9.) The overwhelming weight of authority makes clear that law enforcement officers who respond to an informant's tip or a neighbor's call for assistance are not required by the federal Constitution to limit their observations to the front entranceway of the residence being investigated, and that police conduct of the sort involved here does not violate the Fourth Amendment when the defendant has failed to take even minimal measures to shield his or her activities from public view from a location where other persons reasonably may be anticipated to be present. In departing from this view, the majority imposes a narrow and rigid restraint upon police conduct that elevates notions of trespass to a controlling role and fails to give proper application to the reasonable-expectation-of-privacy standard enunciated by the decisions of the United States Supreme Court.

I would reverse the judgment of the Court of Appeal.

Baxter, J., and Chin, J., concurred.

APPENDIX TO DISSENTING OPINION OF GEORGE, C. J.