[No. C052924. Third Dist. Mar. 27, 2008.]

THE PEOPLE, Plaintiff and Appellant, v.
DANNY ROBERT CHAVEZ, Defendant and Respondent.

COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, John G. McLean and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Appellant.

Meredith J. Watts, under appointment by the Court of Appeal, for Defendant and Respondent.

OPINION

**ROBIE, J.**—The People appeal from the dismissal of two weapons charges against defendant Danny Robert Chavez, contending the trial court erred in granting defendant's motion to suppress. We agree and reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 2, 2005, at approximately 8:39 p.m., Roseville Police Officer Aaron Leahy was dispatched to a motel to talk to defendant's girlfriend regarding a disturbance. She reported that around 12:00 noon that day, she was leaving for work in her Jeep when defendant stopped her, ordered her out of the driver's seat, and took the keys to the vehicle. Defendant drove her to

work and then left with the Jeep, stating that he would never give it back to her.

She asked the officer to go to the residence she shared with defendant and their seven-year-old son to find out if the vehicle was there. She asked the officer to attempt to contact defendant to ask for the keys for her. She stated that she did not want to ask defendant herself because she feared he was still angry with her, and he had been violent in the past. When asked if defendant had access to any weapons, she stated that she had seen a gun in the residence six months earlier. The officer did not know where the child was at the time.

At approximately 9:40 p.m., following his interview of defendant's girl-friend, Officer Leahy and Roseville Police Officer Jeremy Screeton went to the duplex. The Jeep was parked in the driveway. The front grill of the Jeep was warm to the touch, indicating that it had been recently driven. Officer Leahy could see light coming from the crack between the garage door and the house. He did not see any lights on through the front window.

Officer Leahy went to the front door, knocked several times, rang the doorbell, and announced that he needed to speak to defendant. There was no response. The officer then walked along a concrete walkway in front of the residence that led a few feet over to a wooden fence flush with the front of the duplex and with no setback. The fence was approximately six feet high and the officer could see the top of a sliding glass door on the side of the residence. The officer then raised himself approximately three inches onto his tiptoes and shined his light into the sliding glass door. There were no lights on in the house. The officer then called for defendant again.

At that point the officer noticed something shiny on the ground on the other side of the fence near the sliding door. He shined his flashlight down on the object and saw what appeared to be a cocked revolver. The officer could not determine whether it was loaded.

Officer Leahy testified that he believed it was his duty to retrieve the revolver because it was a safety hazard at a residence with a seven-year-old child. He attempted to open the gate, but it was locked, so he climbed over the fence and determined that the gun was unloaded. The officer then put the revolver in his pocket and climbed back over the fence. The officer knocked at the door one more time. He then returned to his patrol car to run the firearm by its serial number.

Defendant was charged with one count of obliterating the identification on a firearm and one count of possession of a firearm by a felon. After the

preliminary hearing, defendant moved to suppress the gun found in his side yard. On May 10, 2006, a hearing was held on the matter. On June 6, 2006, the court granted the suppression motion.

In granting defendant's motion to suppress, the court stated: "In this case, the observations were made—the officer actually had to trespass to make the observations. He was on property of the defendant, not in an area where people normally gain access to the house, but off to the side of the house. There was absolutely no purpose for the officer to be there. There was no emergency. He knocked on the door. Nobody answered the door. He wasn't investigating a crime. According to him, he was simply going to try to convince the defendant to return the car, I don't remember if it was to his wife or significant other, but to another person. Then a justification was made that while there was a gun and there was a child that lived there. We don't even know if the child was there.

"The place where the officer made the observation was not a place that was open to the public to make observations, and it was a six-foot fence. Obviously, defendant intended those things behind the fence to be private. The gate was locked. The officer had to raise himself above the level of the fence to see the weapon present, and for all those reasons I believe that the motion ought to be granted, and it will be granted."

The People appealed after the case was dismissed for lack of evidence.

## DISCUSSION

On appeal, the People contend that the trial court erred in granting defendant's motion to suppress. We agree.

"The Fourth Amendment provides '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . .' (U.S. Const., 4th Amend.) This guarantee has been incorporated into the Fourteenth Amendment to the federal Constitution and is applicable to the states." (*People v. Camacho* (2000) 23 Cal.4th 824, 829 [98 Cal.Rptr.2d 232, 3 P.3d 878].) Evidence obtained as a result of an unreasonable search and seizure is excluded at trial only if exclusion is required by the federal Constitution. (23 Cal.4th at p. 830.)

"In reviewing the trial court's ruling on the suppression motion, we uphold any factual finding, express or implied, that is supported by substantial evidence, but we independently assess, as a matter of law, whether the

challenged search or seizure conforms to constitutional standards of reasonableness." (*People v. Hughes* (2002) 27 Cal.4th 287, 327 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

 When the prosecution relies on evidence obtained by law enforcement officers from a protected area such as a curtilage without a warrant, it bears "the burden of establishing either that no search occurred, or that the search undertaken by the officers was justified by some exception to the warrant requirement" such as exigent circumstances. (*People v. Camacho supra*, 23 Cal.4th at p. 830.)

The People first contend that no search occurred because Officer Leahy observed the revolver in plain sight while lawfully positioned in defendant's front yard in an area open to the public. Secondly, the People contend that the subsequent warrantless entry into defendant's side yard was justified by the exigency of a cocked revolver at a residence with a seven-year-old child. We agree with the People that Officer Leahy's observation of the gun from over the fence did not amount to a search and his subsequent entry into defendant's yard was justified by exigent circumstances. Therefore, the trial court erred in granting defendant's motion to suppress. Accordingly, we will reverse the judgment of dismissal.

I

*The Observations from over the Fence*

 First, we address Officer Leahy's observation over defendant's fence. The Fourth Amendment protects from unreasonable search and seizure only those areas in which a person has a reasonable expectation of privacy. (*United States v. Knights* (2001) 534 U.S. 112, 118–119 [151 L.Ed.2d 497, 505, 122 S.Ct. 587]; *People v. Freeman* (1990) 219 Cal.App.3d 894, 900 [268 Cal.Rptr. 603].) To claim a Fourth Amendment protection, therefore, a defendant must manifest not only his or her own subjective expectation of privacy in the particular place, but that expectation must be one society is prepared to recognize as reasonable. (*People v. Camacho, supra*, 23 Cal.4th at pp. 830–831.)

 In this case, after getting no response at the front door, Officer Leahy walked from the front door, along a concrete walkway, a short distance over to a gate in a standard six-foot wooden fence that was flush with the front of the residence.[1] The People first challenge the lower court's finding that the

---

[1] The People challenge the trial court's finding that the fence was six feet high. We defer to the lower court's factual finding as it is supported by substantial evidence in the record.

officer was trespassing when he went over to the gate. The People correctly point out that the "existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated . . . ." (*United States v. Karo* (1984) 468 U.S. 705, 712–713 [82 L.Ed.2d 530, 540, 104 S.Ct. 3296].) Rather, the relevant inquiry is whether entry is made into an area impliedly open to the public. "A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see." (*Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 629 [108 Cal.Rptr. 585, 511 P.2d 33]; *id.* at p. 632, and cases cited.)

██ " 'It is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing they are free to keep their eyes open. [Citation.] An officer is permitted the same license to intrude as a reasonably respectful citizen. [Citation.] However, a substantial and unreasonable departure from such an area, or a particularly intrusive method of viewing, will exceed the scope of the implied invitation and intrude upon a constitutionally protected expectation of privacy. [¶] What is reasonable cannot be determined by a fixed formula. It must be based on the facts and circumstances of each case. [Citation.]' " (*People v. Thompson* (1990) 221 Cal.App.3d 923, 943 [270 Cal.Rptr. 863].) ██ As summarized by a leading text: "[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." (1 LaFave, Search and Seizure (4th ed. 2004) Residential Premises, § 2.3(f), pp. 598, 600–603, fns. omitted.)

Here, Officer Leahy went to the side gate attempting to contact defendant. It was reasonable for him to do so after getting no response at the front door, in light of the fact that the grill of the car was warm and a light was on in the garage, which suggested that defendant was home. The officer walked on the paved walkway only a short distance from the front door to the side gate. This was not a substantial or unreasonable departure from the normal access to the house. There were no barriers such as planters or trellises blocking public access to the gate. These circumstances suggest that this area was impliedly open to the public and therefore Officer Leahy's position in front of the gate did not violate defendant's reasonable expectancy of privacy in regard to observations made there.

■ From this area in front of the gate, the officer's observation of the revolver was not a search because the revolver was viewed in plain sight. "[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense." (*Lorenzana v. Superior Court, supra*, 9 Cal.3d at p. 634.) Defendant's fence, at approximately six feet tall, prevented only physical intrusion and not observations by persons approximately six feet or taller. Here, Officer Leahy merely raised himself approximately three inches onto his tiptoes when he made the observation. Such a fence does not prevent viewing by anyone taller than Officer Leahy nor in many other circumstances, such as from an adjacent deck, backyard improvement, play set, children's tree house, or neighbor's second-story window. (See, e.g., *Dillon v. Superior* Court (1972) 7 Cal.3d 305, 311 [102 Cal.Rptr. 161, 497 P.2d 505] [backyard vulnerable to observation from a neighbor's second-story window carries no reasonable expectation of privacy and is, in essence, open to public view]; *People v. Claeys* (2002) 97 Cal.App.4th 55, 59 [118 Cal.Rptr.2d 139] [no expectation of privacy in marijuana plants in backyard that were visible over a fence from neighbor's yard]; *People v. Arroyo* (1981) 120 Cal.App.3d Supp. 27, 30 [174 Cal.Rptr. 678] [finding marijuana plant in plain sight where officer looked around tree from common carport area].) Defendant here had not taken extra measures such as construction of a taller fence or vegetational screening to augment an objective expectation of privacy.

■ Furthermore, the officer's use of a flashlight to improve his vision does not affect the plain view of the revolver. "It is well established law that the observation of that which is in the plain sight of an officer standing in a place where he has a lawful right to be does not constitute a search and such observation is lawful regardless of whether the illumination permitting the observation is natural light, artificial light, or light from a flashlight held by the officer viewing the object in question." (*People v. Wheeler* (1972) 28 Cal.App.3d 1065, 1069 [105 Cal.Rptr. 56]; see also *People v. Rogers* (1978) 21 Cal.3d 542, 549 [146 Cal.Rptr. 732, 579 P.2d 1048].)

We agree with the People that this case is distinguishable from *Lorenzana v. Superior Court, supra*, 9 Cal.3d at page 626, *People v. Camacho, supra*, 23 Cal.4th at page 824, and *People v. Lovelace* (1981) 116 Cal.App.3d 541 [172 Cal.Rptr. 65].

In *Lorenzana*, an officer went uninvited to the side of the defendant's house, where there were no doors or defined pathways, and looked into a window through a two-inch gap between the drawn window shade and the sill. (*Lorenzana v. Superior Court, supra*, 9 Cal.3d at pp. 629–630.) The court held this conduct "too closely resembles the process of the police state, too dangerously intrudes upon the individual's reasonable expectancy of privacy, and thus too clearly transgresses constitutional principle." (*Id.* at p. 629.)

In *Camacho*, two police officers went to the defendant's residence at 11:00 p.m. in response to a municipal noise ordinance complaint. (*People v. Camacho, supra*, 23 Cal.4th at p. 828.) Rather than knock on the front door, the two officers went into a side yard and looked into a window where they saw the defendant packaging cocaine. (*Id.* at pp. 828–829.)

In contrast, in this case, the officer observed the revolver from a lawful vantage point. The significantly distinguishing factor is that Officer Leahy did not actually enter into the side yard to make the observation. Officer Leahy stayed in the front yard on the paved walkway in an area open to the public.

In *Lovelace*, the court suppressed the observations of an officer who, standing in a public alleyway with his face an inch or two from the fence, looked through gaps and knotholes into the defendant's yard. (*People v. Lovelace, supra*, 116 Cal.App.3d at p. 554.) The court found "[t]here was no showing that general members of the public or pedestrians got within an inch or two of the fence . . . to gain a glimpse . . . ." (*Ibid.*) "The officer did more than merely look over the fence, choosing to engage in the type of invasion condemned by the *Lorenzana* court." (*Ibid.*)

Assuming (without deciding) that *Lovelace* was correctly decided, it is not on point here because Officer Leahy—unlike the officer in *Lovelace*—did not do "more than merely look over the fence" and did not "engage in the type of invasion condemned by the *Lorenzana* court." (*People v. Lovelace, supra*, 116 Cal.App.3d at p. 554.) Looking over a fence is not conduct that "too closely resembles the process of the police state." (*Lorenzana v. Superior Court, supra*, 9 Cal.3d at p. 629.) Indeed, courts in various other jurisdictions agree that this sort of conduct does not violate a reasonable expectation of privacy. (See, e.g., *Sarantopoulos v. State* (Fla. 1993) 629 So.2d 121 [officer standing on tiptoes to look over six-foot fence did not search the enclosed yard: the fence created no reasonable expectation of privacy since it shielded the yard from view of only those not tall enough to see over it]; *State v. Corra* (1987) 88 Or.App. 339 [745 P.2d 786] [officer's view of marijuana while standing on a rock to peer over a six-foot fence was not search: many people were tall enough to see what he saw over the fence]; *People v. Smola* (1988) 174 Mich.App. 220 [435 N.W.2d 8] [officers observed marijuana by standing on car bumper and looking over a six-foot fence was not a search; Smola had no reasonable expectation that the fence would shield his backyard from observation].) Accordingly, we conclude that Officer Leahy's observation of the revolver while looking over the fence from the front yard did not violate defendant's reasonable expectation of privacy.

## II

### *Going over the Fence*

■ We also conclude that exigent circumstances justified Officer Leahy's subsequent warrantless entry into defendant's side yard to retrieve the revolver. " '[W]arrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' " (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 657, 126 S.Ct. 1943].) " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408].)

At the time of his intrusion into the side yard, Officer Leahy knew the residence was shared by defendant, his girlfriend, and their seven-year-old child. It was 9:40 p.m., and Officer Leahy had not seen the child with his mother at the motel where the interview had occurred. The grill of the Jeep was still warm, indicating it had recently been driven. Thus, it was reasonable for Officer Leahy to believe that both defendant and the child were in the residence. Despite the officers' knocking on the door and announcing their presence, there was no response. Also, the officers knew that defendant had forcibly taken the Jeep from his girlfriend earlier that day and that he had committed acts of domestic violence in the past. Thus, they had reason to suspect that defendant posed a risk of violence. Also, the revolver was in such an unusual place—on the ground outside near the sliding door—it would have been reasonable for Officer Leahy to suspect that defendant had placed it there when he learned of the officers' presence so that it would be out of his possession but within easy reach if he decided to use it.

■ By jumping the fence into defendant's side yard to secure the revolver, Officer Leahy acted reasonably under the circumstances to protect both himself and the child he had reason to believe was in the residence. Moreover, the officer's warrantless entry of the yard and seizure of the gun was " 'strictly circumscribed by the exigencies which justif[ied] its initiation.' " (*Mincey v. Arizona, supra,* 437 U.S. at p. 393 [57 L.Ed.2d at p. 300].) He did not conduct any further search while in the yard and instead did no more than was necessary to eliminate the risk posed by the gun. Under these circumstances, we agree with the People that the warrantless intrusion into defendant's side yard was justified by exigent circumstances. Accordingly, the trial court erred in granting defendant's motion to suppress.

## DISPOSITION

The judgment of dismissal is reversed and the trial court is directed to vacate its order granting the motion to suppress and to enter a new order denying that motion.

Morrison, Acting P. J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 30, 2008, S163583. George, C. J., did not participate therein.